IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY

**JAMIE RAMSEY,**

    **Plaintiff,**

v.                                                                  Civil Action No. 5:17-cv-01374

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Brief in Support of Complaint and Motion for Remand (ECF No. 19) and Defendant's Brief in Support of Defendant's Decision (ECF No. 20). This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for supplemental security income (SSI) under Title XVI of the Social Security Act.

Background

Claimant, Jamie Ramsey, filed an application for SSI on January 11, 2013. Claimant alleged disability beginning January 1, 2012. The claim was denied initially on May 15, 2013, and upon reconsideration on October 21, 2013. Claimant filed a request for hearing on December 18, 2013. A video hearing was held on January 27, 2015, with Claimant appearing in Mt. Hope, West Virginia and the Administrative Law Judge (ALJ) in presiding over the hearing from Roanoke, Virginia (Tr. at 12). The ALJ denied Claimant's application on March 23, 2015. Claimant requested the Appeals Council review the ALJ's decision. The Appeals Council denied Claimant's request for review on December 28, 2016 (Tr. at 1-4). Subsequently, Claimant brought

the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

## Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520 and 416.920 (2017). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a) and 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b) and 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c) and 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d) and 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e) and 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-869 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f) and 416.920(f)

(2017). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.*
>
>> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See

3

> 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation:
>> Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental

disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section. 20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since January 11, 2013, the application date (Tr. at 14). Under the second inquiry, the ALJ found that Claimant suffers from the medically determinable impairments of bipolar affective disorder, attention deficit hyperactivity disorder (ADHD) and anxiety disorder. (*Id.*) However, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. at 15). The ALJ found that Claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, with the following exceptions: she is limited to low-stress job (defined as having only occasional decision-making or occasional charges in work settings) with occasional interaction with the public or co-workers. She will likely be distracted from work activity not more than 10% of a normal workday and absent from a workplace not more than once a month (Tr. at 17). The ALJ concluded that transferability of job skills is not an issue because Claimant

5

has no past relevant work (Tr. at 23). The ALJ found that Claimant can perform jobs in the national economy such as assembler, packer and inspector/tester/sorter (ECF No. 24). Accordingly, the ALJ denied Claimant's application for SSI (Tr. at 25).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was born on May 9, 1992. She was 20 years old on the date she filed her SSI application. She last completed the eleventh grade (Tr. at 34). On the date of the hearing, Claimant stood at 5'4" tall and weighed 367 pounds (Tr. at 40). She lives with her mother and stepmother (Tr. at 52).

The Medical Record

The medical record has been adopted, as set out in the Claimant's Brief, Defendant's Brief and the ALJ's decision to the extent as follows.

On March 27, 2008, approximately four years before her alleged onset date of disability, Claimant presented to Safiullah Syed, M.D., of Appalachian Psychiatric Services who diagnosed her with attention deficit hyperactivity disorder (ADHD) and depression (Tr. at 238-239). Plaintiff also reported a history of cutting herself (Tr. at 238). Dr. Syed prescribed Adderall but at Claimant's request did not prescribe antidepressant medication (Tr. at 239). Claimant saw Dr. Syed on April 25, 2008, at which time her mother reported that Claimant's behavior and schoolwork improved although she still had issues with anger (Tr. at 237). Claimant had stopped cutting herself and counseling was helping (Tr. at 237). Dr. Syed prescribed Geodon for Claimant's anger issues and advised her to return in three months (Tr. at 237). On July 18, 2008, Dr. Syed continued Claimant's medications with no changes as Claimant was doing well and reported major mood swings (Tr. at 236). Dr. Syed advised Claimant to return in three months (Tr. at 236). At an October 14, 2008, visit, Dr. Syed again noted that Claimant was doing fairly well on her medication regimen, which had helped with her mood swings and school work (Tr. at 235). Claimant's mother had "no complaints" (Tr. at 235). Claimant was advised to return in three months (Tr. at 235). Claimant's mental status examinations with Dr. Syed from April 2008 through October 2008 revealed that Claimant was alert, oriented, quiet and calm (Tr. at 235, 236, 237).

On January 5, 2009, Claimant's mother reported to Dr. Syed that Claimant's anger had improved on Invega (Tr. at 234). Claimant was alert and oriented; appeared calm with good eye contact; and had no delusions, hallucinations or suicidal ideation (Tr. at 234). Dr. Syed continued Claimant's medication and she was advised to return in three months (Tr. at 234).

7

Claimant was hospitalized at Appalachian Hospital for four days in March 2009 (2 years and ten months before her alleged onset date of disability) for "mood problems" and suicidal/homicidal threats related to being bullied at school and not getting along with her mother's partner (Tr. at 233). Claimant was diagnosed with bipolar affective disorder and her mediations were changed to Abilify, Celexa and Adderall; Invega was discontinued. On April 9, 2009, Claimant returned to Dr. Syed and appeared alert, oriented and calm. She smiled and denied suicidal or homicidal thoughts. Claimant was advised to take Abilify and Celexa at night to avoid daytime grogginess and to return in three months. On July 6, 2009, Claimant reported doing well on her medications and her anger, mood swings and focus improved (Tr. at 232). She was alert, oriented and calm (Tr. at 232). Dr. Syed advised her to return in three months (Tr. at 232). At her September 28, 2009, visit with Dr. Syed, Claimant reported doing fairly well although she had some difficulty with her school work (Tr. at 231). She was alert and oriented and Dr. Syed advised her to return in three months (Tr. at 231).

On January 21, 2010, two years before Claimant's alleged onset date, Claimant appeared distressed as she was still being bullied at school (Tr. at 230). Dr. Syed continued her medication and advised her to return in three months (Tr. at 230). However, Claimant returned the next month, on February 3, 2010 (Tr. at 229). She appeared depressed and tearful and was refusing to return to school. Dr. Syed continued her medication. On April 15, 2010, Claimant's mother reported that she "finally got her homebound" but was sleeping during the day and not taking her medication as prescribed (Tr. at 228). Her mother reported that the medication helped Claimant when she took it. On examination, Claimant appeared alert, oriented and calm. Dr. Syed observed Claimant reading a book. Claimant's medications were continued and Dr. Syed advised her to return in three months. On August 9, 2010, Claimant's mother reported that

she has done fairly well (Tr. at 227). She appeared alert, oriented and calm and was to report back to the clinic in three months. On October 21, 2010, Claimant presented to Dr. Syed and was irritable and angry; she reported arguing with her mother and wanting to live with her grandparents (Tr. at 226). Dr. Syed continued Claimant's medications.  One month later, on November 3, 2010, Claimant was doing fairly well (Tr. at 225). She was alert, oriented and calm with no major issues.  Dr. Syed continued Claimant's mediations and advised her to return in three months.

On February 1, 2011, one year before Claimant's alleged onset date of disability, she reported doing well on her medication and reported no major issues (Tr. at 224). She was doing well with her schoolwork, and Dr. Syed continued her medications and advised her return in three months.  When examined by Dr. Syed on April 26, 2011, Claimant's mother reported that Claimant continued to do well with no major issues (Tr. at 223).  She was seeing Ed Jones, a counselor, and that had helped. Dr. Syed continued Claimant's medication and advised her to come back in three months, however he gave her a prescription for six months' worth of medication because Claimant might not be able to return due to insurance issues.

Claimant began counseling with Anna Stout-Tuckwiller on December 17, 2012, one year and eight months after her last visit with Dr. Syed, and reported being off her mediation since she attained age 18 because she lost her medical card (Tr. at 250).  Claimant reported numerous symptoms since being off of her medication but stated that she had not cut herself for more than a year (Tr. at 251). Claimant had a depressed mood, but otherwise was cooperative, displayed appropriate behavior, had a normal thought process and content, appeared alert and oriented, maintained satisfactory attention and had intact insight and judgment with no evidence of suicidal or homicidal ideation. Ms. Stout-Tuckwiller provided

Claimant with samples of Abilify since she did not have medical insurance (Tr. at 252). On December 31, 2012, Claimant showed significant improvement since starting Abilify (Tr. at 248). After this initial visit, Ms. Stout-Tuckwiller saw Claimant monthly.

On January 28, 2013, Claimant saw Ms. Stout-Tuckwiller and reported "doing quite well recently" (Tr. at 256). Ms. Stout-Tuckwiller noted that Claimant had a "good" response to treatment (Tr. at 257). On February 25, 2013, Claimant reported doing well on her medication (Tr. at 258). Ms. Stout-Tuckwiller noted that Claimant "is not disabled" (Tr. at 258). Ms. Stout-Tuckwiller continued Plaintiff's medication and recommended that she continue to look for a job (Tr. at 259). On March 29, 2013, Claimant stated to Ms. Stout-Tuckwiller that she was doing well and had no complaints or concerns regarding her medication (Tr. at 261). She wanted to restart trying to obtain her GED and asked to be restarted on her ADHD medication. On April 26, 2013, Claimant reported doing well on her medication and Ms. Stout-Tuckwiller did not recommend any changes (Tr. at 263). On May 24, 2013, Claimant reported doing well on her medication (Tr. at 267) but had some issues with affordability (Tr. at 268). Ms. Stout-Tuckwiller provided Claimant with medication samples of Abilify. In June 21, 2013, Claimant stated she continued to do well on her medication (Tr. at 269). Ms. Stout-Tuckwiller recommended that Claimant file her West Virginia RX paperwork so that she could obtain coverage for Abilify, eliminating her need to return on a monthly basis (Tr. at 270). On July 19, 2013, Claimant reported doing well with her medication (Tr. at 271) and Ms. Stout-Tuckwiller continued her on the same medication (Tr. at 272). Ms. Stout-Tuckwiller noted again that she only saw Claimant monthly to give her medication samples until she could obtain approval from West Virginia Rx. (*Id.*) Mental status examinations during Claimant's visits with Ms. Stout-Tuckwiller revealed the following findings:

- alert and oriented (Tr. at 256, 258, 261, 263, 267, 269, 271);
- speech fluent and non-pressured (Tr. at 256, 258, 261, 263, 267, 269, 271);
- memory intact (Tr. at 256, 258, 261, 263, 267, 269, 271);
- attention and concentration fair (Tr. at 256) or satisfactory (Tr. at 258, 261, 263, 267, 269, 271);
- thought processes connected and logical (Tr. at 257, 259, 261, 263, 267, 269, 271);
- no delusions or preoccupations (Tr. at 257, 259, 261, 263, 267, 269, 271);
- mood "good" (Tr. at 257, 259, 262, 263, 267, 269, 271);
- affect full (Tr. at 257, 259, 262, 263, 267, 269, 271);
- judgment and insight intact (Tr. at 257, 259, 262, 263, 267, 269, 271); and
- no suicidal/homicidal ideation (Tr. at 257, 259, 262, 263, 268, 269, 271).

On May 15, 2014, ten months after her last visit with Ms. Stout-Tuckwiller, Claimant returned to Dr. Syed and reported that she was seeking treatment at Seneca, where Ms. Stout-Tuckwiller is employed, but had not taken any medication for a month (Tr. at 283). Claimant appeared alert, oriented and pleasant on examination (Tr. at 284). She had normal thought processes and content with no suicidal or homicidal ideation. Dr. Syed noted that Claimant reported mood, irritability and attention/concentration issues. Dr. Syed opined that Claimant had fair memory, insight, and judgment. On August 7, 2014, Claimant returned to Dr. Syed and reported that Abilify helped (Tr. 282). She was alert, oriented, and had no delusions, hallucinations or suicidal thoughts. She reported panic attacks for which Dr. Syed prescribed Ativan and advised her to return in three months.

On January 22, 2015, Claimant reported she was doing fair but was having panic attacks (Tr. at 281). Dr. Syed observed that Claimant was alert, oriented, calm and had no suicidal or homicidal thoughts and advised her to return in three months. On January 15, 2015, Dr. Syed also wrote a letter stating that Claimant's bipolar affective disorder "negatively affect[ed] her ability to be employed" (Tr. at 276).

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ did not properly apply the "treating physician rule" (ECF No. 19). Claimant asserts that the ALJ gave "limited weight" to her treating physician's opinion even though there was not evidence to the contrary. (*Id.*) Claimant avers that the jobs the ALJ found Claimant could perform were not consistent with her limitations. (*Id.*)

In response, Defendant asserts that substantial evidence supports the ALJ's evaluation of the opinion by Claimant's treating physician (ECF No. 20). Additionally, Defendant avers that substantial evidence supports the ALJ's reliance on the opinion of the vocational expert (VE) where Claimant has not cited any credible evidence undermining the validity of the VE's testimony. (*Id.*)

Discussion

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 04.1505(a); *see Heckler v. Campbell*, 461 U.S. 458, 459-60 (1983); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[An impairment] is not necessarily disabling. There must be a showing of related functional loss."). The responsibility for determining whether Claimant is disabled resides with the Commissioner. 20 C.F.R. § 404.1527(e)(1). To be eligible for disability benefits, Claimant bears the burden of showing not only that she has a medically determinable impairment, but that it is so severe that it prevents her from engaging in her past relevant work or any other substantial gainful activity that exists in the national economy for a 12-month period. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

Weight Afforded Medical Opinions

For claims filed before March 27, 2017,[1] the standards for evaluating medical opinion evidence are set forth in 20 C.F.R. § 404.1527. That regulation defines "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *See* 20 C.F.R. § 404.1527(a)(1). For purposes of the regulation, an "acceptable medical source" includes a licensed physician or psychologist. *Id.* § 404.1502(a). The regulation provides that the ALJ "will evaluate every medical opinion" presented to him, "[r]egardless of its source." *Id.* § 404.1527(c). Generally, however, more weight is given "to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." *Id.* § 404.1527(c)(1).

Treating Physician

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2) (2012). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2) (2012). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R.

---

[1] For claims filed on or after March 27, 2017, the rules in § 404.1520c apply. The new SSA regulations make a number of changes, including: (1) eliminating the treating physician rule; (2) expanding the definition of "acceptable medical sources"; and (3) reducing the articulation standards required of ALJs in assessing medical source opinions. For example, while under the SSA's new regulatory scheme, a medical source's "treatment relationship" with a claimant remains a factor considered when assessing the persuasiveness of medical source opinions, no controlling weight analysis or deferential weight presumption attaches to any opinion.

§§ 404.1527(d)(2) (2012). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527. These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2).

In regards to the weight given to the opinion of Dr. Syed, the ALJ stated the following:

> The undersigned has considered the opinion of Safiullah Syed, M.D. but accorded it limited weight. Dr. Syed wrote regarding the claimant in January 2015, "At this time [her] diagnosis of Bipolar Affective Disorder negatively affects her ability to be employed." (EX. 6F at 1.) Dr. Syed is an acceptable medical source within the meaning of the regulations, and he has a treating relationship with the claimant. However, he did not provide a function-by-function assessment of the claimant's limitations or details regarding the degree to which the claimant's affective disorder "negatively affects her ability to be employed." It is possible that he meant that the claimant would have mental limitations due to her diagnosis, such as those described in the residual functional capacity above. However, to the extent that his opinion is read as endorsing disability limitations, it is inconsistent with the medical evidence of record as a whole, as the claimant has required only conservative psychiatric treatment, with good response to treatment, and mental status examinations have been normal (Tr. at 22-23).

Claimant asserts that the ALJ gave Dr. Syed's opinion "limited weight" due to the fact that the treating physician did not provide a function-by-function assessment relationship with the claimant (ECF No. 19). Claimant argues that the treating physician rule does not require a function-by-function assessment in order for the treating physician's opinion carry great weight. (*Id.*) Claimant avers that "if the presiding administrative law judge had difficulty in 'weighting' the treating physician's opinion, the presiding administrative law judge had other avenues to solicit more information from the treating physician." Claimant avers that the ALJ gave "limited weight" to the treating physician's opinion because it "was not in a format or custom that the Social Security Administration could easily work with," not because "there was a medical opinion stating that the [Claimant] could work." (*Id.*)

Claimant's medical records reflect that treatment with Ms. Stout-Tuckwiller showed improvement. Records report that Claimant responded well to her medication regimen. Ms. Stout-Tuckwiller's notes report that Claimant is "doing quite well recently" and that Claimant had a "good" response to treatment, including the prescription Abilify (Tr. at 252-257). Ms. Stout-Tuckwiller noted that Claimant "is not disabled" and recommended that Claimant "continue looking for a job" (Tr. at 258-259).

In March 2013, Claimant informed Ms. Stout-Tuckwiller that she was doing well and had no complaints or concerns regarding her medications (Tr. at 261). Claimant reported that she wanted to obtain her GED and asked to restart ADHD medication. (*Id.*) Ms. Stout-Tuckwiller saw Claimant monthly to give her medication samples until Claimant could obtain approval of "West Virginia Rx" (Tr. at 272). In her April 2013, May 2013, June 2013 and July 2013 office visits, Claimant reported doing well on her medications (Tr. at 263-271). The office notes

reporting Claimant's improvement on medication conflicts with Dr. Syed's suggestion that Claimant is disabled.

Additionally, mental status examinations during Claimant's visits with Ms. Stout-Tuckwiller reflected that she was alert and oriented, with memory intact, her attention and concentration were fair or satisfactory, her thought processes were connected and logical, her mood was good, she did not experience delusions or preoccupations, her judgment and insight were intact and that she had no suicidal/homicidal ideation (ECF No. 20).

The ALJ found Dr. Syed's opinion to be inconsistent with the evidence of record, including Claimant's conservative psychiatric treatment, her good response to treatment and normal mental status examinations (Tr. at 23). Mental status examination by Dr. Syed reflect that Claimant reported anxiety and mood issues. However, Dr. Syed's mental status examinations also reflected that Claimant was alert, oriented, calm without delusions and without suicidal or homicidal thoughts (Tr. at 281-284). A mental status examination dated May 15, 2014, also states that Claimant shows fair memory, insight and judgment (Tr. at 284). Consequently, the ALJ disagreed with Dr. Syed's opinion as it was inconsistent with the record as a whole.

## Vocational Expert

At the administrative hearing, the ALJ elicited vocational expert (VE) testimony to obtain evidence regarding work that exists in the national economy. The ALJ asked the VE whether a hypothetical individual with Claimant's vocational background (younger individual, limited education, and no past relevant work experience) could perform work that exists in significant numbers in the national economy if limited to a low-stress job with no more than occasional interaction with the public and coworkers (Tr. at 53). The ALJ defined a low stress job as "one that has only occasional decision-making or changes of work setting." (*Id.*) The

vocational expert testified that such an individual with the aforementioned limitations could perform unskilled work as an assembler, packer and inspector/tester/sorter (Tr. at 53-54). The VE further testified that such an individual could perform the aforementioned occupations even if he/she were off-task up to 10 percent of the workday and absent from work once a month (Tr. at 54).

Claimant argues that she cannot perform two of the jobs listed by the VE due to limitations in her residual functional capacity. She avers that the limitation of "having only occasional decision making or occasional change in work setting" prevents her from being able to perform the job of a sorter. Claimant asserts that the job of a sorter "categorizes and rejects sheets of cork," therefore, it goes beyond the limitations of her residual functional capacity (ECR No. 19). Likewise, Claimant asserts that she cannot perform the job of a folder because "it requires one to apparently change work settings often or to make decisions on a constant basis." However, according to the DOT descriptions, the jobs of sorter and folder only require the performance of repetitive or short-cycled work (See DOT 569.687-022 and DOT 369.687-018). Therefore, neither jobs require more than occasional decision-making or changes in work setting.

Claimant asserts that the residual functional capacity limiting her to performing a "low-stress job" hampers her ability to work as an assembler or packer. Claimant avers that the term "low-stress job" could be used to limit some if not all production rate jobs to meaning that of low production. However, the ALJ defined "low-stress job" as "one that has only occasional decision-making or changes of work setting" and did not place any restriction on pace (Tr. at 53). More so, the VE testified that based on the ALJ's definition of low-stress job, the hypothetical individual could perform either job. Therefore, neither job is restricted by the limitations in Claimant's residual functional capacity.

Conclusion

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Brief in Support of Complaint and Motion for Remand (ECF No. 19) and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED and a copy will be submitted to the Honorable Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Berger and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date: March 12, 2019

Dwane L. Tinsley
United States Magistrate Judge